UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SANDOR TORRES THIESSEN,

Petitioner,

v.

WILLIAM KNIPP, et al.,

Respondents.

No.  2:13-cv-0722 JAM GGH

**FINDINGS AND RECOMMENDATIONS**

*Introduction and Summary*

Petitioner was convicted of two counts of attempted murder with a ten year enhancement on each count for use of a firearm.  After his conviction was affirmed on direct review, petitioner filed numerous state habeas corpus petitions, including five in the Superior Court.  All state petitions containing the issues brought in the federal petition, were denied either on procedural grounds, or alternatively on the merits for some claims.

Petitioner brings a number of claims herein which respondent claims are all procedurally barred.[1]  The merits for many, if not all, claims are reached by respondent in an alternative analysis.  For the reasons that follow, all claims except two should be dismissed as procedurally

---

[1]  The undersigned will use "procedurally barred" and "procedurally defaulted" interchangeably.

1

barred, and the two excepted claims discussed below should be denied on their merits.

*Brief Factual Background*

Given the fact that many of the claims herein are procedurally barred, the facts of the case have less direct involvement in the adjudication here.  Nevertheless, the context of the case explains the nature of the claims, barred or not.  The undersigned repeats the rendition of those facts by the Court of Appeal.

> Jamila Williams testified she was shot at about 9:00 p.m. on August 26, 2009. She was visiting an apartment complex on 43rd Avenue near Martin Luther King Boulevard, and was on the sidewalk standing near two people, "Dakota" and "Mexicuz" (Fresquez). A four-door silver car drove by. Fresquez told Dakota, "'There they go,'" and as Williams looked up, the car stopped, shots were fired, and people scattered. Williams ran after the first of two shots she heard, but was felled and saw her "leg blown wide open[.]" FN1 Fresquez was also felled. Williams admitted telling the police she thought the driver looked like "Shorty," but testified she had been referring to a woman.
>
> FN1. A bullet broke Williams's right femur, and injuries on her left leg indicated she may have been shot twice, or was twice injured by one bullet.
>
> Carla Basurto, who did not want to testify, testified she had two children by defendant Ramirez, known as "Puppet." Ramirez also had two children by Basurto's mother, Minda Arias, and stayed with Arias, who shared a duplex with Basurto. Basurto knew Orantes as "Shorty" and Thiessen as "Loco." On August 25, 2009, the day before the shooting, Basurto, Ramirez and friends got drunk to celebrate Basurto's birthday. Basurto passed out in the afternoon and did not know of a fight between Ramirez and Fresquez. She claimed not to remember much about the next day, but testified that when she spoke to detectives she had told the truth. At some point, Ramirez sent Basurto's brother Nathaniel and Orantes to get something, perhaps money, from Fresquez, possibly using her sister's silver car. After Nathaniel and Orantes returned, the men talked, Ramirez seemed "pissed off," and then left.
>
> Basurto admitted telling the detectives that her brother Nathaniel was upset and afraid "'that they were going to jump [Nathaniel] and he felt like [Orantes] didn't defend him.'" She denied seeing Thiessen at that point, but testified she saw him that night or "early morning of the next day" by a liquor store. She admitted she may have told the detectives she saw Ramirez, Orantes and Thiessen leave together, but testified, "that's not what I remember right now."
>
> She told the detectives she saw a gun in a pillowcase, and that there were guns in a crawl space on Arias's side of the duplex, and there were two shotguns, but testified she had learned these were not real guns, but air guns or BB guns. She

also denied knowing the difference between real and fake guns. She could not remember if she told detectives she saw Ramirez get a gun and put it in the trunk of a car on the night of the shooting. She later denied remembering telling them there were two brown shotguns and a black rifle. She did not recall saying that when the men left, Orantes was driving, Ramirez was in the front passenger seat, and Thiessen was in the back. She remembered saying they came back "'like 20 minutes later'" and "It happened really quick.'" When Ramirez returned, he yelled to Basurto and Arias to get the kids, and two carloads of people left the duplex. Fresquez testified he was a current state prisoner serving time for false imprisonment, and he had two prior convictions, for residential burglary and possession for sale of narcotics. He had sold Ramirez a vest that was supposed to be bulletproof, but lacked the armor plates that were designed to fit in it. Fresquez learned Ramirez wanted a refund, and went to Ramirez's duplex to discuss the matter the day before he got shot. When Fresquez arrived, "a whole bunch of people started beating me up." He could not remember who beat him, and claimed that when he spoke to detectives in the hospital, he was on drugs and therefore whatever he had told the police would not be reliable.

The next day, as Fresquez and his girlfriend were walking, Orantes "rode up on me" in a white or silver car. "He asked for the money. I told him to go to 43rd. And when they hit 43rd I had a whole bunch of friends out there, too. I guess they ran up to the car and they took off." There were three other people in that car, including "Chaparro," but Thiessen was not one of them. That evening, as Fresquez was standing outside an apartment with "Dakota," a car that looked like the car Orantes had driven earlier drove by, and Fresquez heard gunshots. He turned to run and was struck by a bullet.FN2 Fresquez at first could not recall having told detectives that Orantes was still driving the car, but then confirmed he had done so, but he picked Orantes's photograph only because "it looked like a similar car that he was driving." He did not see Ramirez or Thiessen in the car. He had used methamphetamine that day.

FN2. Fresquez sustained a gunshot wound to the abdomen that broke his pelvis.

Detective Brandon Luke testified he spoke with Fresquez at the hospital on September 8, 2009, and he seemed able to understand and respond to questions. Fresquez identified defendant Orantes as the driver of the car involved in the shooting, but could not identify anybody else in the car. Fresquez said that the day before, Ramirez, Orantes, Chaparro and Thiessen beat him up. On October 27, 2009, Luke spoke with Fresquez at the jail medical unit, and he identified a picture of Orantes as the driver.

On October 29, 2009, Luke spoke with Basurto, who came to the police station at his request. A video recording of her interview was played at trial. FN3 Luke and Detective Robert Stewart participated in the interview. Basurto told them Ramirez was having a dispute with Arias, so he was staying with Basurto instead, and

3

Orantes came with Ramirez to the house because "they're like partners." Ramirez sent Orantes and Basurto's brother Nathaniel to do something, "I think pick up money" from Fresquez, using her sister's silver car. When they came back, "my brother was upset that they were gonna jump him and he felt like [Orantes] didn't defend him, but I really don't know. [Ramirez] got all bent outta shape because he was very pissed off and then they left[.]" By "they" she meant Orantes, Thiessen and Ramirez. Orantes was driving, Ramirez was in the front passenger seat, and Thiessen was in the back. According to Basurto, Ramirez retrieved a black rifle from under the duplex and placed it in the trunk.

FN3. The transcripts of the Basurto and Thiessen recordings were not admitted into evidence, but were provided in the Clerk's Transcript. However, the parties cite them freely, treating them as accurate transcriptions of the taped interview, so we shall do the same.

About 20 or 30 minutes later Ramirez and Orantes returned, and Ramirez was crying and "screaming for me and [Arias] to grab our kids and run[.]" With Orantes's help, they took the kids away from the house in two cars. Ramirez "was scared they were gonna come and retaliate" and hid in the house for about a week. Although Ramirez first denied shooting someone, he later told Basurto he had shot "the guy" and a "girl" while he was slouched down in the passenger seat. Ramirez told Basurto that Fresquez had disrespected Basurto's brother by trying to jump him.

The Thiessen jury heard testimony about Thiessen's interrogation and watched a video recording of it. Thiessen had been in jail, and when he was brought to the stationhouse, he was allowed to see that Ramirez was also there. During the interview, the detectives implied that Ramirez and others had spoken to them about the shooting, and indicated they wanted to hear Thiessen's side of the story. At first he denied any involvement. He later admitted that he, Ramirez and Orantes "ass whooped" Fresquez over a vest on Basurto's birthday. When the detectives indicated they had searched a garage, Thiessen said, "Fuck. Alright. And you found the weapons." Thiessen also asked what the charges would be, how much time he would face, and whether he could still be released on January 13, 2010, his then-current release date for the unrelated case that caused him to be in jail. Thiessen elaborated about the vest, stating that when someone was about to shoot Thiessen while he was wearing it, Thiessen realized it lacked the critical armor inserts. As a consequence, Thiessen, Ramirez and Orantes beat Fresquez up. Fresquez did not provide a refund, and later, with some friends, jumped Basurto's brother Nathaniel ("Sleepy"), who had been trying to resolve the dispute amicably. Then Thiessen, wielding a shotgun he claimed was inoperable, and Ramirez, wielding a rifle, got into a car that Orantes drove. When Fresquez was located, Ramirez fired two shots.

According to Thiessen, he pointed his shotgun at Fresquez through the same

4

window Ramirez fired through and pulled the trigger, but his shotgun did not fire. The men then returned to Ramirez's house, which they evacuated for fear of retaliation.

Arias testified on behalf of Ramirez. Ramirez was her "children's father," and she was unhappy that Ramirez, who was "like my husband[,]" was having a sexual relationship with her daughter. They argued about this relationship the entire day of the shooting, and Ramirez never left the residence except when they both went to a gas station. There was a BB gun that looked like a rifle at the house, but no real guns.

In argument, Orantes took the position there was no showing that Ramirez intended to kill anyone, no showing Orantes knew of Ramirez's purpose, and there remained a reasonable doubt about whether Orantes was the driver. Ramirez argued Basurto lied to the police, and there was insufficient evidence he had an intent to kill. Thiessen argued his inculpatory statements were not reliable due to intimidation, and the evidence indicated only two people were in the car, Ramirez and Orantes.

Thiessen's jury convicted him of two counts of attempted premeditated murder, and two counts of shooting from an occupied vehicle, and sustained firearm enhancements. The other jury convicted Ramirez and Orantes of two counts of shooting from a vehicle and the attempted premeditated murder count involving Fresquez, but acquitted both men of the attempted murder count involving Williams.

People v. Thiessen, 202 Cal. App. 4th 1397, 1400-1403 (Cal. App. 2012) (partial publication)

*Pertinent Procedural History*

The federal petition (First Amended Petition, ECF # 33) sets forth the following claims:

Ground I--Ineffective Assistance of Counsel (Both Trial and Appellate)

1. Ineffective assistance of trial and appellate counsel for failing to object, or otherwise have redacted, a portion of the video which hinted at gang involvement;

2. Ineffective assistance of counsel for not retaining a medical expert and producing evidence to the effect that petitioner could not have fired the weapon he was alleged to have used given the physical condition of his hand;

3. Ineffective assistance of counsel regarding the failure of counsel to advocate a theory that petitioner could not have been sitting in the front passenger seat as some evidence may have indicated;

4. Ineffective assistance of counsel for failing to ask for a continuance regarding the calling of a

5

medical witness (Dr. Leo), and/or subpoenaing the witness (this claim deals with alleged coercion during petitioner's interrogation);

5.  Ineffective assistance of counsel for failing to utilize Maria Navarrette as an alibi witness;

6.  Ineffective assistance of counsel for failing to call petitioner as a witness, and/or improperly waiving petitioner's right in this regard.

Ground II- Ineffective Assistance of Appellate Counsel—not raising the issue of inflammatory pictures.

Ground III—Introduction/admission of inflammatory pictures

Petitioner's direct review involved alleged coercive confession (direct claim related to I-3 above), trial court error with respect to permitting gang references (direct claim related to I-1 above), use of "kill zone" instructions, erroneous firearm enhancement, and sentencing error as issues.  The petition for review (denied summarily) raised essentially the same issues.

The first habeas corpus petition, filed in Superior Court on October 25, 2012, raised no specific claims and was denied on November 7, 2012, because:

Petitioner summarily claims that he was denied effective assistance of counsel,

than attaches a copy of what appears to be the opening brief on his appeal.  He also

summarily claims he was denied due process, and again attaches a copy of what

appears to be the first part of the opening brief on his appeal.

ECF 1 at 14 (electronic pagination).

The Superior Court further found that California case law (In re Waltreus, 62 Cal. 2d 218 (1965) and In re Harris, 5 Cal. 4th 813, 829 (1993), precluded raising issues in habeas corpus which had been decided on direct review.  To the extent petitioner had alleged actual innocence, any such claim was denied because particular facts had not been alleged demonstrating innocence.

Petitioner's second, Superior Court petition, filed on February 4, 2013, asserted (as appears in Claim I-1 above) that counsel was ineffective because she had failed to object to a portion of the interrogation video from which it could be discerned that an interrogating detective wore a "gang suppression" unit jacket, i.e., a jacket which had lettering to that effect.  This

6

1    petition also raised what are now Claims I-2, I-3, I-4, and I- 5 of the federal petition.

2    This petition was denied on March 18, 2013 as successive, the Superior Court citing In re Clark, 5

3    Cal 4th 750 , 787-798 (1993) and in re Robbins, 18 Cal 4th 770, 811-812 (1998).  ECF # 1 at 17-

4    18.  In addition, the Superior Court, citing In re Waltreus, 62 Cal. 2nd 218 (1965), held that Claim

5    1 had been "essentially" raised on direct appeal as the straight error claim for introduction of the

6    video, unadorned with an "ineffective counsel" component, and had been adjudicated adverse to

7    petitioner.  A citation to Waltreus, that a claim has been exhausted "too much" is ineffective in

8    federal court to preclude review on procedural bar grounds, and renders a decision that the claim

9    is successive irrelevant .  Hill v. Roe, 321 F.3d 787 (9th Cir. 2003).

10         Petitioner's further claim that counsel had been ineffective for failing to call a physical

11   medical expert (Claim I-2 in the federal petition) was *not* denied on procedural grounds, but

12   rather was denied on its merits as a failed actual innocence claim.  ECF #1 at 19.

13         Moreover, petitioner's claim of ineffective assistance for failure to advocate the "physical

14   impossibility" of evidence suggesting that petitioner sat in the front passenger seat (Claim I-3

15   above) was procedurally barred as successive,  ECF # 1 at 20, as was petitioner's claim that the

16   psychologist or psychiatrist (Dr. Leo) would have testified concerning coercion in petitioner's

17   interrogation. (Claim I- 4 above)  ECF # 1 at 17.  Finally, the Navarrette alibi ineffectiveness

18   claim (Claim I-5 above) was also held to be defaulted.  ECF #1 at 17.

19         Claim I-6 (ineffectiveness for not calling petitioner as a witness) above was not raised in

20   this second, habeas petition.

21         On March 28, 2013, petitioner filed a habeas corpus petition with the Court of Appeal.  He

22   raised issues, as listed above, Claim I-1, 2, 3, 4, and 5.  This petition was summarily denied on

23   April 16, 2013.  A second appellate habeas petition was filed on May 21, 2013, repeating the

24   substance of the first appellate opinion, and adding number I-6 as well.  The petition was

25   summarily denied on June 10, 2013.  Yet a third appellate habeas petition was filed on August 2,

26   2013 with a single claim of introduction of inflammatory evidence (pictures) along with

27   ineffective assistance of counsel in connection with the introduction of such evidence. Grounds II

28   and III of the federal petition.  Apparently this petition was denied summarily on August 8, 2013.

1    Petitioner had also filed a third (filed April 3, 2013) and a fourth (filed April 8, 2013)

2    petition for habeas corpus with the Superior Court.  The third petition raised what is Claim I-6 of

3    this federal petition—failure to permit petitioner to testify.  The fourth petition was a

4    substantively identical reprise of the second state petition.  The Superior Court denied these

5    petitions (ECF # 33 at 25-27) on April 18, 2013 as being successive, but also found that the first

6    claim (ineffective assistance of counsel for failure to have the gang aspects of petitioner's

7    interview redacted) had been presented to the state appellate court on direct review citing In re

8    Waltreus, 62 Cal. 2d 218 (1965)—again, a citation which makes the procedural bar citations

9    irrelevant to this federal petition.  See ECF # 33 at 26.

10    Yet a fifth Superior Court petition was filed on May 14, 2013 now claiming that the

11    introduction of certain inflammatory photographs was trial error and ineffective assistance of

12    counsel (Claims II, III).  This petition was denied on May 29, 2013 as successive and abusive.

13    And a sixth petition filed on June 12, 2013 repeating the allegations of the fifth petition, was

14    denied (procedurally barred) on July, 22, 2013.

15    A petition in the California Supreme Court was filed on September 23, 2013, raising all

16    the claims set forth in this federal petition.  This petition was pending at the time of filing the

17    federal petition (April 12, 2013), but finally summarily denied on January 15, 2014.

18    *Procedural Default*

19    Prior to analyzing which claims are barred by the doctrine of procedural default under

20    federal habeas law, it is necessary to determine which claims have actually been barred by the

21    state courts.  Petitioner's blizzard of state habeas petitions makes the task somewhat difficult.

22    Claim I-1 of the federal petition, ineffective assistance of counsel for not objecting to, or

23    otherwise redacting, a video which showed the police interrogator wearing a jacket with a "gang"

24    insignia, was not procedurally defaulted.  Whatever the procedural correctness of the

25    determination, and in addition to determining that the petition was conclusory, the Superior Court

26    in its first habeas decision believed that this claim had been decided on direct review. [2] See also

27

28    [2]  Ineffective assistance of counsel was not raised *per se* on direct review; however, the direct
analogue "trial court error" of that same claim was raised.  The undersigned need not determine

8

1  the second Superior Court decision.  A citation to <u>In re Waltreus</u> does not stand as a procedural

2  bar in federal court.  <u>Hill v. Roe</u>, <u>supra</u>.  And subsequent habeas petitions barred because of their

3  repetitive nature do not change the fact that the claim was considered to have been raised on

4  direct review.  There is no bar for ineffective assistance Claim I- 1.

5        Claim I-2 (petitioner could not possibly have fired a weapon as the tip of his trigger finger

6  was missing), as previously indicated was not defaulted, but rather was decided on its merits in

7  the second Superior Court determination, albeit as an "actual innocence" exception to the

8  California successive petition bar.

9        Claim I-3 -5 are a different matter.  These claims surfaced for the first time in the second

10  Superior Court habeas petition, and were the subject of a successive petition and Waltreus default

11  determination.  The silent denials of the appellate and state supreme court are presumed to have

12  been based on this default.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797 (1991).  And simply because the

13  state court did an alternative determination on the merits does not lessen the impact of the default

14  as long as such was clearly stated, as is the case here, by the Superior Court.  <u>Loveland v.</u>

15  <u>Hatcher</u>, 231 F.3d 640 (9th Cir. 2000).  But again, the later determinations of the Superior Court

16  re-invoking the <u>Waltreus</u> bar have no effect.  Whether the successive petition bar was valid under

17  federal habeas law will be analyzed below.

18        Claim I-6 is more difficult to analyze.  This claim was actually raised in the appellate

19  court (second petition) a few days before it was raised in the third Superior Court petition.

20  However, the Superior Court decided its third petition on procedural default grounds prior to the

21  decision of the appellate court.  (April 18 versus June 10).  There is no reason in the record,

22  therefore, not to utilize the "look through" presumption, and have the appellate court silent denial

23  based on the procedural default ground of the third Superior Court decision.  In any event, the

24  petition in the Supreme Court post-dated all of these decisions, and would also be subject to the

25  look through presumption.  Claim I-6 is subject to procedural default as a successive petition.

26        Grounds II and III were defaulted by the Superior Court in the fifth state habeas petition

27  _____

28  whether the two claims mirror each other absent the Superior Court determination.  The *sine qua non* for procedural bar is a state court ruling invoking an effective bar.

9

1    as successive/abusive claims (May 29, 2013).  This decision predated the denial of the Court of

2    Appeal (August 8).

3

4         A federal habeas court will not review a claim rejected by a state court if the
          decision of [the state] court rests on a state law ground that is independent of the

5         federal question and adequate to support the judgment.' " [Beard v.] Kindler, 558
          U.S. 53, 55, 130 S.Ct, at 615 (quoting Coleman v. Thompson, 501 U.S. 722, 729,

6         111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). The state-law ground may be a
          substantive rule dispositive of the case, or a procedural barrier to adjudication of

7         the claim on the merits. See Sykes, 433 U.S., at 81–82, 90, 97 S.Ct. 2497, 53
          L.Ed.2d 594.

8    
9         * * *

10        To qualify as an "adequate" procedural ground, a state rule must be "firmly
          established and regularly followed." Kindler,558 U.S., at 60-61, 130 S.Ct., at 618

11        (internal quotation marks omitted).FN4 [omitted] "[A] discretionary state
          procedural rule," we held in Kindler, "can serve as an adequate ground to bar

12        federal habeas review." Ibid. A "rule can be firmly established' and regularly
          followed,'" Kindler observed, "even if the appropriate exercise of discretion may

13        permit consideration of a federal claim in some cases but not others." Ibid.
          California's time rule, although discretionary, meets the "firmly established"

14        criterion, as Kindler comprehended that requirement. The California Supreme

15        Court, as earlier noted, framed the timeliness requirement for habeas petitioners in
          a trilogy of cases. See supra, at 3 [citing Clark, Robbins, and In re Gallego, 18 Cal.

16        4th 349, 77 Cal.Rptr.2d 132, 959 P.2d 290 (1998). Those decisions instruct habeas

17        petitioners to "alleg[e] with specificity" the absence of substantial delay, good
          cause for delay, or eligibility for one of four exceptions to the time bar. Gallego,

18        18 Cal.4th, at 838, 77 Cal.Rptr.2d 132, 959 P.2d at 209; see Robbins, 18 Cal.4th,

19        at 780, 77 Cal.Rptr.2d 153, 959 P.2d, at 317.

20

21   Walker v. Martin, 562 U.S. 307, 316(2011) (abrogating Townsend v. Knowles, 562 F.3d 1200

22   (9th Cir.2009)) as quoted in Lumentut v. Hartley, 2014 WL 1779465 (E.D. Cal. 2014.[3]

23        The only procedural bar that need be discussed here is that of successive petition, i.e., a

24   Clark bar, as all of the aforementioned claims (with two exceptions noted) were brought in a

25   successive petition. In addition to the substantive law regarding procedural default, the Ninth

26   Circuit has constructed a procedural process for invocation of the bar.  First, a respondent must

27   _____

28   [3]  The discussion here, and in the following four paragraphs was the same as set forth in the
     undersigned's opinion in Lumentut v. Hartley

1   expressly invoke the bar.  Second, a petitioner must articulate specific reasons why he believes

2   the bar to be invalid under federal procedural default law.  An exception to this specific

3   articulation is the situation where the Ninth Circuit has previously held the bar to be inadequate,

4   or not clearly established/regularly followed; in this situation all a petitioner need do is object to

5   the invocation of the bar. If petitioner meets his burden, respondent then has the ultimate burden

6   of proving the legitimacy of the bar.  See Bennett v. Mueller, 322 F.3d 573, 585 (9th Cir.2003);

7   King v. Lamarque, 464 F.3d 963, 967–68 (9th Cir.2006).

8           While the Ninth Circuit, previous to Martin, had previously refused to legitimize the Clark

9   timeliness procedural bar, there is no such case law regarding successive petitions determined to

10  be so post-Clark.  See Stancle v. Clay, 692 F.3d 948, 957 (9th Cir.2012): "We agree that

11  California courts do not generally review unjustified successive petitions.  See In re Morgan, 50

12  Cal.4th 932, 944(Corrigan, J., concurring and dissenting);  In re Clark, 5 Cal.4th 750, 767-771

13  (1993)."  See also Siripongs v. Calderon, 35 F.3d 1308, 1318 (9th Cir.1994) (concluding that

14  before Clark, California's successive petition rules were not adequate and independent).

15          Moreover, one could reasonably argue, and the undersigned so finds, that the Supreme

16  Court's disavowal of the Ninth's Circuit's objections to invocation of Clark in the timeliness

17  context also stood to disavow any objection to the related, successive petition bar.  This finding

18  by the undersigned was validated in the case of Johnson v. Lee, ___U.S. __, 136 S.Ct., 1802,

19  2016 WL 3041051 (2016) in which the Supreme Court struck down the Ninth Circuit's finding

20  that the Dixon bar (cannot raise in habeas what should have been brought on direct review) was

21  not adequate because the respondent in that case had not shown that the state courts invariably

22  applied that bar if appropriate.  Instead, Johnson focused on the strength of the state supreme

23  court's clear holdings that the bar was an important part of state habeas law.[4]

24          If the Supreme Court found such with respect to the Dixon bar, it would certainly make

25  the same finding for the time honored, well established, and firmly held successive petition bar as

26  _____

27  [4]  It is unclear the extent to which the Ninth Circuit Bennett paradigm survives Walker v. Martin
    and Johnson v. Lee in which the Supreme Court brushed off any analytical framework for testing
    the timeliness and direct appeal bars, and simply held them valid based on the strength of  state
28  supreme court holdings.

1    explicated in In re Clark and subsequent cases.  Indeed, the parallel procedural bar is well

2    enshrined in federal practice by statute.  28 U.S.C. section 2244 (a), (b).

3         In any event, petitioner made no objection whatsoever to the adequacy of the bar, much

4    less a specific articulation why the bar could not be applied.  Therefore, respondent did not bear

5    the burden validating the bar.  Thus, subject to the further discussion below, Claims I 3-6, and II,

6    III are clearly defaulted as successive.

7         Petitioner did, however, object to application of the bar asserting, in essence, the "cause

8    and prejudice" exception to the procedural default rule.  This exception to procedural default

9    requires permissible "cause," i.e., a fact external to petitioner's defense which caused the default.

10   High v. Ignacio, 408 F.3d 585, 590 (9th Cir.2005) (quoting Murray v. Carrier, 477 U.S. 478, 488

11   (1986)).  Objective factors that exemplify cause include interference by officials that makes

12   compliance with the state's procedural rule impracticable, a showing that the factual or legal basis

13   for a claim was not reasonably available to counsel, or constitutionally ineffective assistance of

14   counsel.  Murray, 477 U.S. at 488.  Prejudice requires a finding of actual harm resulting from the

15   alleged constitutional violation.  Thomas v. Lewis, 945 F.2d 1119, 1123 (9th Cir.1991).  If

16   petitioner cannot demonstrate cause and prejudice, his claim must be one which would cause a

17   fundamental miscarriage of justice if not reviewed on the merits, i.e., petitioner is actually

18   innocent of the conviction offense.  See Majoy v. Roe, 296 F.3d 770, 775–76 (9th Cir.2002).

19        Within the context of cause, the Supreme Court has found for ineffective assistance of

20   counsel claims that if such claim must, for all intents and purposes, be brought in habeas

21   proceedings (subject to very infrequent exceptions), and the petitioner was not represented by

22   counsel in that first habeas proceeding , or was represented by ineffective counsel, such

23   constitutes cause.  This was the holding of Martinez v. Ryan, ––– U.S. ––––, 132 S.Ct. 1309

24   (2012) carving out an exception to Coleman v. Thompson, 501 U.S. 722 (1991).

25   The Supreme Court reaffirmed Martinez a year later in Trevino v. Thaler, ––– U.S. ––––, 133

26   S.Ct. 1911 (2013).  In Martinez, Arizona law had categorically forbidden a criminal defendant

27   from raising a claim of trial-counsel IAC on direct appeal, requiring instead that such a claim be

28   raised in an initial-review collateral proceeding.  In Trevino, Texas law did not categorically

1   forbid a criminal defendant from raising a claim of trial-counsel IAC on direct appeal.  Trevino,

2   133 S.Ct. at 1915. But the Court recognized that it was "highly unlikely" that appellate counsel

3   would have a "meaningful opportunity" to raise such a claim.  Id at 1921.  The Court held that, in

4   this circumstance, a procedural default of an underlying trial-counsel IAC claim by post-

5   conviction counsel could be excused upon a finding of "cause" under the standard articulated in

6   Martinez.

7           The Court in Martinez established a four-part test for excuse of a procedural default of a

8   trial-counsel IAC claim by an ineffective post-conviction counsel.  The procedural default may be

9   excused if there is "cause" for the default.  "Cause" under Martinez has a different meaning than

10  under Coleman.  "Cause" is established under Martinez where:  (1) the claim of "ineffective

11  assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no

12  counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state

13  collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-

14  assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial

15  counsel [claim] ... be raised in an initial-review collateral review proceeding."  Trevino, 133 S.Ct.

16  at 1918 (alterations in original).  As described above, Trevino slightly modified the fourth

17  requirement to allow a finding of "cause" where it is "highly unlikely," such claim can be raised

18  on direct appeal as is the rule that exists in California, see Ha Van Nguyen v. Curry, 736 F.3d

19  1287 (9th Cir.2013) (pro se petitioners benefit from the Martinez rule.)  Therefore, subject to the

20  discussion on substantiality below, there is "cause" to excuse the state imposed successive

21  petition default for the ineffective assistance of counsel claims I-3-5, as these claims, absent from

22  the first state habeas petition, were set forth in the second petition.

23          Not so, however, for Claim I-6, and II, III.  These claims were first brought in a petition

24  subsequent to the second.  The Martinez exception does not apply past being unrepresented in the

25  initial petition.  All petitioner demonstrates as "cause" for his delayed bringing of these claims in

26  a third or later petition is a professed ignorance of the law, and that he brought them as soon as he

27  found out about them.  Such is insufficient.  Murray v. Carrier, 477 U.S. 478, 486-87 (1986); see

28  generally Raspberry v. Garcia, 448 F.3d 1150, 1154 (9th Cir. 2006).

1    As far as the last escape hatch for procedural default goes -- fundamental miscarriage of

2    justice -- the standard for such, actual innocence," is not even approached in this case given that

3    Claims II and III involve only an alleged prejudicial admission of otherwise relevant evidence.

4    Petitioner proffers no potential testimony (Claim I-6) that could in any credible way meet the

5    standards of actual innocence, especially given that petitioner made pre-trial admissions of being

6    in the vehicle from which the murder took place and of utilizing a weapon in the crime.  These

7    three claims will not be reviewed on their merits.

8    This brings the procedural default (bar) discussion to the substantiality of Claim I, 3-5.  As

9    set forth above, Claim I-3 involved petitioner's assertion that he could not have been sitting in the

10   front passenger seat as some witnesses had placed him, and therefore, trial counsel was

11   ineffective in not emphasizing that fact.  However, as aptly pointed out by respondent as well as

12   the Court of Appeal (discussing a related issue), petitioner admitted to pointing a weapon outside

13   the front passenger window, and attempting to fire the weapon.  This act, at the very least,

14   emboldened the probable shooter in firing his weapon and hitting the victim.  Precisely where

15   petitioner was situated in the car, front or rear, therefore had little to do with the gist of the case.

16   The claim is not substantial.

17   Next, Claim I-4 is likewise insubstantial.  Petitioner asserted that counsel was ineffective

18   for not calling Dr. Leo as a witness.  This doctor would have testified, petitioner asserts, to the

19   fact that petitioner was coerced into saying the very damaging statements elicited at the police

20   interview that the jury heard, and that very likely convicted petitioner.  Most important to the

21   determination here is the fact that petitioner has presented nothing in the way of *evidence* to back

22   his bald assertion.  And, again, as respondent highlights, and the Court of Appeal set forth on the

23   direct coerced confession claim, petitioner appeared far from intimidated at his interview; rather

24   he was the quintessential cocky witness who believed he could handle his interview or even

25   manipulate it.  While it is true that counsel early on wrote to petitioner that she thought the expert

26   might be helpful, and even if not calling this witness was something that just fell through the

27   cracks, no expert exists who could logically say, after reviewing the transcript and video, that

28   petitioner's will was overborne during the police interview.

14

Finally, Claim I-5, the "failure" by counsel to call Maria Navarrette, petitioner's girlfriend, as an alibi witness, was no failure at all. Ms. Navarrette was allegedly prepared to say that petitioner was with her during the time of the drive-by shooting, even remembering the title of a movie that they watched together. But this could not be. After all, petitioner admitted his presence in the drive-by car, and admitted his use of a weapon in that car. Calling a witness who may have given (as she attempted to do later in the investigation process) testimony to the effect that petitioner was with her at all times pertinent to the drive-by shooting would have looked nonsensical. Moreover, Ms. Navarrette's initial failure to remember *anything* when asked by investigators, and then remembering *everything* about petitioner's whereabouts at the critical time, would have been adversely transparent to the jury as looking through a piece of clear glass. This claim is insubstantial as well.

For the reasons given above, Claims I 3-5, 6 and Claims II and III are procedurally defaulted. The undersigned will not further review them on the merits.

*The Merits of Claims I-1-2.*

 A. <u>Claim I -1(Ineffective  assistance of trial and appellate counsel for failing to object, or otherwise have redacted, a portion of the video which hinted at gang involvement)</u>

As was argued on direct review in a straight, non-ineffective, assistance of counsel claim, petitioner claimed that his due process rights were violated when the jury saw his videotaped statements/admissions showing for a time an interrogator wearing a jacket displaying "gang unit" lettering. He repeats this claim adding that his counsel was ineffective for not either objecting to its admission or seeking its redaction. [5]

---

[5]  The standards for showing ineffectiveness in the AEDPA context are so well established, they barely warrant repetition here:

> There is no dispute that the clearly established federal law here is <u>Strickland v. Washington</u>. In <u>Strickland</u>, this Court made clear that "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation ... [but] simply to ensure that criminal defendants receive a fair trial." 466 U.S., at 689, 104 S.Ct. 2052. Thus, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Id.</u>, at 686, 104 S.Ct. 2052 (emphasis added). The

15

1    Insofar as petitioner alleges his counsel was ineffective under state law, the opinion of the

2    state appellate court on direct review (straight due process claim), and the Superior Court on

3    habeas review (ineffective assistance of counsel) mirroring that assessment, completely negates

4    any finding of ineffective assistance of counsel based on state law because of lack of prejudice.

5    The appellate court found and held:

6    In any event, after the Basurto video recording was partially played , the trial

7    recessed for lunch.  When trial resumed, all counsel moved for a mistrial, because

8    ────────────────────────────────────────────────

9    Court acknowledged that "[t]here are countless ways to provide effective
     assistance in any given case," and that "[e]ven the best criminal defense attorneys

10   would not defend a particular client in the same way." Id., at 689, 104 S.Ct. 2052.

11   Recognizing the "tempt[ation] for a defendant to second-guess counsel's assistance
     after conviction or adverse sentence," ibid., the Court established that counsel

12   should be "strongly presumed to have rendered adequate assistance and made all
     significant decisions in the exercise of reasonable professional judgment," id., at

13   690, 104 S.Ct. 2052. To overcome that presumption, a defendant must show that
     counsel failed to act "reasonabl[y] considering all the circumstances." Id., at 688,

14   104 S.Ct. 2052. The Court cautioned that "[t]he availability of intrusive post-trial
     inquiry into attorney performance or of detailed guidelines for its evaluation would

15   encourage the proliferation of ineffectiveness challenges." Id., at 690, 104 S.Ct.

16   2052.

17   The Court also required that defendants prove prejudice. Id., at 691–692, 104

18   S.Ct. 2052. "The defendant must show that there is a reasonable probability that,
     but for counsel's unprofessional errors, the result of the proceeding would have

19   been different." Id., at 694, 104 S.Ct. 2052. "A reasonable probability is a
     probability sufficient to undermine confidence in the outcome." Ibid.

20   That requires a "substantial," not just "conceivable," likelihood of a different
     result. Richter, 562 U.S., at ——, 131 S.Ct., at 791.

21

22   Our review of the California Supreme Court's decision is thus "doubly
     deferential." Knowles v. Mirzayance, 556 U.S. ——, ——, 129 S.Ct. 1411, 1413,

23   173 L.Ed.2d 251 (2009) (citing Yarborough v. Gentry, 540 U.S. 1, 5–6, 124 S.Ct.
     1, 157 L.Ed.2d 1 (2003) (per curiam) ). We take a "highly deferential" look at

24   counsel's performance, Strickland, supra, at 689, 104 S.Ct. 2052, through the
     "deferential lens of § 2254(d)," Mirzayance, supra, at ——, n. 2, 129 S.Ct., at

25   1419, n. 2. Pinholster must demonstrate that it was necessarily unreasonable for
     the California Supreme Court to conclude: (1) that he had not overcome the strong

26   presumption of competence; and (2) that he had failed to  undermine confidence in

27   the jury's sentence of death.

28   Cullen v. Pinholster, 511 U.S. 170, 189-190 (2011).

16

during the portion of the recording seen by the jury, Detective Luke is twice seen wearing a jacket with "Sheriff [] Gang Unit" emblazoned on the back, when he stands up to leave and then returns and sits down. The motion was denied, and the trial court noted the recording had already been heavily sanitized. Later, Thiessen's counsel stated she wanted a limiting instruction regarding this incident, but counsel for Orantes and Ramirez stated they did not. Thiessen's counsel did not submit such an instruction.

When Detective Goncalves testified about the Thiessen interrogation (before the Thiessen jury alone), he identified himself as "a detective with the gang suppression unit." No objection was interposed at that time, but at the next break, Thiessen's counsel moved for a mistrial. In denying the motion, the trial court stated in part, "You're making a whole lot out of nothing" and advised counsel to propose a limiting instruction if desired.

On appeal, all defendants contend the gang references were prejudicial violations of the purported in limine order, and their chances of getting a fair trial were irreparably damaged…

We agree with the trial court that this is "a whole lot out of nothing." There was no testimony that the defendants or victims were even affiliated with any gang, much less members, and no testimony the drive-by shooting was gang related. (Cf. People v. Cardenas (1982) 31 Cal.3d 897, 904-906 (plur. opn.) [prejudicial inference that attempted store robbery was a "gang operation" and defendants were aging affiliates]; People v. Maestas (1993) 20 Cal.App.4th 1482, 1497 ["California courts have long recognized the potentially prejudicial effect of gang membership evidence"].) Further, even had the juries inferred defendants were involved with a gang, based on the stray mention of the term "gang" during trial, neither jury was exposed to any prejudicial gang information, such as descriptions of violent gang incidents.

Nor do we believe the defenses would have been undermined even had either jury leapt to the conclusion any defendant was a gang member. (Cf. People v. Avitia (2005) 127 Cal.App.4th 185, 194-195 [improper gang evidence weakened defendant's testimony reported by the victim].) Both juries heard evidence defendants were involved in obtaining a bulletproof vest and seeking vengeance by means of a drive-by shooting because that vest was defective. Given such evidence, the implication of gang membership would not have altered either jury's verdict.

Therefore the trial court acted within its discretion in denying the mistrial motions pertaining to gang evidence.FN6

FN6. To the extent defendants recast the claim as a federal due process violation, our conclusion that the juries would not draw prejudicial inference from the stray references to gangs answers the parallel federal claim. (See People v. Gonzales & Soliz (2011) 52 Cal.4th 254, 281, fn. 8; People v. Partida (2005) 37 Cal.4th 428,

439 ["admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*"].)

(Lodged Doc. 4 at 17-19.)

This court is bound by the pronouncement of the Court of Appeal that no prejudice accrued under state law.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To the extent that ineffective assistance under federal law requires a misfeasance or malfeasance recognized as a violation of established Supreme Court authority, petitioner's claim fails.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (recognizing that the Supreme Court has not found a due process violation by the introduction of prejudicial evidence).  Assuming that a derelict act under any federal case law will suffice for ineffective assistance analysis[6], see McKinney v. Rees, 993 F.2d 1378, 1385 (9th Cir. 1993) (finding due process error in the introduction of prejudicial evidence under non-AEDPA circumstances), petitioner can hardly claim the type of prejudice found actionable in McKinney.

The jury in petitioner's case would hardly have had to travel far in its thought process to infer from the facts of this drive-by shooting alone that some type of gang involvement might have been involved—it was inherently obvious from the facts alone.  The seeing of a gang unit insignia on a police officer's jacket would not have been earthshaking to the jury; it was to be expected.  Simply because gang offenses were not charged does not mean that any and every explicit reference to gangs was prejudicial in this case when the facts reeked of gang like activity.  While the prosecution was not at liberty to emphasize gang activity to fill in evidentiary gaps, that did not happen in this case.

This ineffective assistance of counsel claim should fail.

////

_____

[6]  The undersigned need not analyze here whether the failure to object under federal law for Strickland purposes should be scrutinized only using Supreme Court established authority as the basis for analysis, or whether the underlying facts of unreasonableness on the part of counsel , or prejudice, could be viewed by reference to closely on point circuit or other authority.  Of course, the ultimate analysis is whether the state courts were AEDPA unreasonable in coming to a conclusion that ineffective assistance took place.

1

2

   B.   Claim I-2 (Ineffective assistance of counsel for not retaining a medical expert and producing evidence to the effect that petitioner could not have fired the weapon he was alleged to have used given the physical condition of his hand)

3

4

5

6

   Petitioner produces no evidence whatsoever that his finger injury -- missing the tip of his index finger -- precluded his firing a weapon with that finger, or another finger, or with his other hand.  Petitioner's claim is all the more illusory when one focuses on his admission, given in the facts above, *that he actually did pull the trigger of his weapon*.

7

8

9

10

   The Superior Court read this claim as one for actual innocence—that is why it was not found defaulted-- but it is more correctly a garden variety ineffective assistance claim which does not even approach any standard for actual innocence.  However labeled, the reasoning of the Superior Court definitively demonstrates why petitioner's claim here must fail:

11

12

13

14

      First, petitioner fails to attach any reasonably available documentary evidence, such as an affidavit from a physician, to show what testimony could have been presented by an expert that would have established actual innocence, let alone that would have been reasonably likely to have made a difference in the outcome of the trial, were the Robbins bar not applicable (Harris, supra; Strickland v. Washington (1984) 466 U.S. 668).

15

16

17

18

19

20

      Second, petitioner does attach [a] transcript of what appears to have been a motion under *People v. Marsden* (1970) 2 Cal.3d 118, during which time trial defense counsel informed the court that counsel had decided not to hire a doctor because the vast majority of petitioner's finger was still present and could have been used to fire the gun, or petitioner could have used his second, third, or fourth finger to fire the gun; further, counsel did not believe that counsel could find any expert to testify that because a person is missing the tip of a finger that the person cannot fire a gun. Petitioner does not now present an expert who would have testified otherwise.

21

22

23

24

25

26

27

      Third, as detailed in the Third District Court of Appeal opinion on the appeal in this case, petitioner himself told the detectives that he pointed a shotgun through the window and pulled the trigger so that the shotgun made a sound, to make sure that Ramirez heard the click and could not say to petitioner that petitioner did not even pull the trigger. Further, the Third District concluded that by pointing the shotgun alongside Ramirez as Ramirez aimed a rifle at the intended victim and pulling the trigger to make a click noise, petitioner emboldened Ramirez to shoot, thereby "using" the firearm to facilitate the commission of the crimes and sufficiently establishing the firearm enhancement found true. Thus, by petitioner's own words it was established that he could, and did, pull the trigger on the gun.

28

19

As such, petitioner fails to establish that he could not have pulled the trigger, and therefore fails to establish actual innocence. The claim, therefore, is denied.

(Lodged Doc. 10 at 2-3.)

No lengthy ineffective assistance discussion need be made here citing and analyzing AEDPA ineffective assistance cases which categorize two factors for this claim : deficient action of counsel, and prejudice, i.e., shaking a jurist's confidence in the just outcome the case. See Harrington v. Richter, 562 U.S. 86 (2011); Bell v. Cone, 535 U.S. 685, 696-698 (2002)(discussing the standards). Counsel had more than a tactical reason for not presenting an expert (she would have looked foolish to even present the issue), and petitioner goes no distance whatsoever in demonstrating prejudice for his inconsistent, present-day assertion that he could not pull a trigger.

This claim should be denied on the merits.

*Conclusion*

Every claim is procedurally barred save for two ineffective assistance of counsel claims, Claim I-1, I-2. These latter two claims should be denied on their merits.

The undersigned recommends that no certificate of appealability be issued.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  June 22, 2016

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE